## COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.                                     SUPERIOR COURT DEPARTMENT
                                               CIVIL ACTION NO. _____

| | |
|---|---|
| **DMB FINANCIAL LLC,** | ) |
| **Plaintiff,** | ) |
| v. | ) |
| **SYMPLE LENDING, LLC and BEYOND FINANCE, LLC** | ) |
| **Defendants.** | ) |

### AFFIDAVIT OF JOHN CARON

I, John Caron, on oath, do hereby depose and state as follows:

1. I am the Chief Revenue Officer of DMB Financial, LLC ("DMB"), and I make this affidavit on my own personal knowledge.

2. DMB is in the debt settlement business. More specifically, DMB helps consumers with credit card debt reduce that debt by negotiating on their behalf directly with the credit card companies.

3. As part of its business, DMB regularly enters into contracts with people and/or entities who will market to and enroll potential consumers in one of DMB's debt settlement programs. DMB refers to such people/entities as "Affiliates" and the contract as "DMB Financial Affiliate Sales Agreement."

4. In or about January of 2021, I, on behalf of DMB, began negotiating with Symple Lending, LLC ("Symple") to have it become an Affiliate and also in contemplation of

1

purchasing an equity interest in Symple. Those negotiations initially were unsuccessful, but I stayed in touch with Symple's representatives.

5.  On May 13, 2021, Symple and DMB entered into an Affiliate Agreement (the "Agreement" a true copy of which is attached hereto as **Exhibit 1**). Exhibit A to the Symple Agreement (which is our standard commission schedule for Affiliates), is attached hereto as **Exhibit 2**. Nevertheless, DMB agreed to pay Symple at commission rates higher than on our standard commission schedule because, in part, we asked Symple to work exclusively for DMB. As the Agreement states in Section 7.1, Symple:

> Agrees that it will not market or promote any other debt settlement program during the term of this Agreement without DMB's express written consent and all Consumers that [Symple] contacts regarding the program will only be attempted to be enrolled in the program.

6.  The only consent DMB ever gave, allowing Symple to enroll consumers in another debt settlement program, was with respect to a program in Illinois operated by ClearOne Advantage, LLC. In fact, this was the only instance in which Symple asked for DMB's consent to market any other debt settlement program. I directly discussed this with Mr. Houston Fraley, Symple's CEO.

8.  At the time the Agreement was executed, I had informed Symple that DMB had been involved in lawsuits brought by (i) the Commonwealth of Massachusetts (the "Massachusetts Action") and (ii) the Bureau of Consumer Financial Protection (the "CFPB Action"). I also told Symple the nature of those lawsuits, that the CFPB Action had been settled, and that DMB expected the Massachusetts Action to be settled soon. The Massachusetts Action was settled in principle in early August and the court approval of that settlement was later was granted.

9.      On May 13, 2021, Symple and DMB also entered into a Letter of Intent (the "LOI" a true copy of which is attached hereto as **Exhibit 3**), which contemplated DMB's purchase of a 30% equity interest in Symple.

10.     Because Symple was in need of funds, and in light of the business relationship between Symple and DMB and the prospect of DMB purchasing 30% of Symple's equity, DMB advanced Symple $110,000 towards the purchase of that equity.

11.     After signing the LOI, Symple informed DMB that it had another partner in its business and that partner would not approve DMB purchasing equity in Symple. Nevertheless, because Symple was operating as DMB's Affiliate, and that relationship was going well, I told Mr. Fraley and Gary Lozano, Symple's CRO, that while DMB had to be reimbursed for the $110,000 that it paid towards the contemplated equity transaction, DMB would not immediately demand reimbursement so that Symple could continue to grow.

12.     In order to further the DMB-Symple Affiliate relationship, DMB also took the following steps:

- On multiple occasions DMB advanced Symple its monthly commissions before they were due under the terms of the Agreement to assist Symple with cash flow, so it could continue marketing and meet payroll.

- DMB provided Symple with confidential information that allowed Symple to obtain a lending license in Utah in 4-6 months less time than it would have taken Symple to obtain one without access to this confidential information.

- DMB customized – at its own cost – a Customer Relations Management ("CRM") system based on Symple's sales process.

- DMB agreed to reduce by 50% the cost of credit reports of customers pulled by Symple through DMB's system, and DMB covered that cost. This meant that DMB lost approximately $1,000 per month.

- DMB introduced Symple to digital media companies to help it grow.

- DMB introduced Symple to, and approved it working with, DMB's Data Scientist (at a discount) to help Symple improve the performance of its direct-mail marketing.

- DMB built custom reports and performance dashboards to satisfy Symple's specific requests (at DMB's cost).

- DMB gave Symple access to DMB's direct mail design team and provided input on Symple's direct mailers to help boost the performance of Symple's direct-mail marketing.

- DMB built custom email and SMS "drip campaigns" and templates for Symple at DMB's cost.

- After one of Symple's agents engaged in conduct resulting in a customer complaint, DMB handled the issue with the Better Business Bureau and the American Fair Credit Council on Symple's behalf.

- DMB changed how it calculated monthly commissions to assist Symple with cashflow by getting it paid referral fees faster.

13. As is self-evident, many of the foregoing efforts by DMB did not even benefit DMB. Moreover, DMB would not have done all of this if Symple had not agreed to the exclusivity provisions in Section 7.1 of the Agreement.

14. Symple had total new client enrollment volume (debt enrolled in a DMB program) of the following:

- June: $1,698,529.98
- July: $1,913,348.88
- August: $1,988,038.81
- September: $2,081,531.40
- October: $687,842.00 (with the last enrollment being on October 8)
- November: Zero

15. DMB has paid Symple all of the commissions that it was due for the sales that it made, as set forth above except for approximately $6,000. DMB has not paid this amount in light of Symple's failure to abide by its obligations under the Agreement and because Symple has not reimbursed DMB for the $110,000 advanced in connection with the LOI. In this regard, I again note that DMB paid commissions at a rate higher than what was on Exhibit A to the Agreement (which are our standard commissions). The drop in enrollments from September to October of $1.4M will cost DMB approximately $161,000 in lost revenue.

4

16.     In or about the end of October, I learned from one of DMB's employees that two customers that Symple had enrolled with DMB's program had withdrawn and had signed up to use a debt settlement program operated by Beyond Finance ("Beyond"), a direct competitor of DMB. Attached hereto as **Exhibit 4** is an email from one of these customers confirming this. At or about the same time, I noticed that leads from Symple no longer were converting into customers of DMB. In light of this, I suspected that Symple was now marketing Beyond's programs to consumers. On December 6, 2021, I spoke to Shawn Syndergaard of Beyond, who acknowledged that Symple was marketing Beyond's debt settlement program. That program directly competes with DMB's program.

17.     I directed DMB's counsel to demand that Symple immediately (i) cease and desist from working with Beyond and/or any other competitors of DMB for the duration of the term of the Agreement; (ii) re-affirm its obligations under the Agreement and pledge to abide by them; and (iii) pay DMB $275,000 as damages for its breaches of the Agreement, as reimbursement for DMB's legal fees and expenses incurred to enforce the Agreement and as reimbursement of the $110,000 that DMB advanced Symple at the outset of their business relationship. Symple refused. At that point, DMB cut-off Symple's access to DMB's CRM.

18.     Notwithstanding all of the foregoing, all DMB wants is for Symple to abide by the terms of the Agreement and make DMB whole for the damages that it has suffered and the legal fees and expenses it has incurred. If Symple does that, DMB will restore Symple's access to the CRM.

Signed under the penalties of perjury, this 9th day of December, 2021

_____
John Caron

4862-2814-4133.3