# EXHIBIT

# 1

# DMB FINANCIAL AFFILIATE SALES AGREEMENT

**THIS AGREEMENT** (the "Agreement") is made and effective this 13th day of May by and between DMB Financial, LLC, a Massachusetts Limited Liability Company ("DMB") with its principal place of business at 500 Cummings Center, Suite 3550, Beverly, MA 01915, and Symple Lending, LLC a Wyoming Limited Liability Company ("Affiliate"), with its principal place of business 30 N Gould Street Suite 11985 Sheridan, WY 80821. DMB and Affiliate are herein individually referred to as a Party and collectively referred to as the "Parties".

## RECITALS:

DMB is in the business of marketing and operating a debt settlement program (the "Program") DMB also operates an affiliate program that allows affiliates to market and enroll potential consumers into the Program;

Affiliate owns and operates a Financial Services Enrollment company that desires to offer the Program to individual consumers that have expressed an interest in debt settlement solutions. Such individuals are hereinafter referred to as "Consumers";

Affiliate's representatives shall be trained by DMB to market the Program to Consumers and on how to enroll Consumers into the Program;

DMB desires and Affiliate agrees to utilize the facilities and expertise of Affiliate in order to support DMB's marketing of the Program pursuant to the terms and conditions of this Agreement; and

NOW, THEREFORE, in consideration of the promises and mutual covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Affiliate and DMB agree as follows:

1. **Recitals.** The above recitals are true and complete and incorporated herein by this reference.

2. **Responsibilities.**

    2.1 Affiliate shall use reasonable best efforts to market the Program to Consumers and attempt to enroll Consumers in the Program. Unless otherwise specifically provided in this Agreement or separately agreed to in writing, each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

    2.2 Affiliate shall adhere to all local, state, and Federal laws during the course of contacting and speaking with Consumers regarding the Program.

    2.3 Affiliate shall obtain the names of Consumers through its normal marketing channels, the purchase of leads and other methods that are compliant with the FTC guidelines outlined in the final ruling on July 29, 2010 and any other applicable laws related thereto. Affiliate may also contact Consumers it has had a previous relationship with whom may be interested in the Program by making outbound telephone calls to such Consumers.

2.4 Affiliate shall provide DMB with copies of all marketing materials, including but not limited to, call scripts, direct mail pieces, rebuttal scripts, digital advertising materials, and any other materials that mention the Program, for DMB's approval or approval by a third party to verify compliance with all applicable laws related to the Program.

2.5 Affiliate shall meet no less than quarterly with DMB to review all materials related to section 2.4. No new materials shall be used to market the Program without DMB's express written consent.

2.6 Affiliate shall use DMB's CRM system to enroll Consumers Into the Program unless express written consent is provided by DMB for Affiliate to use a 3rd Party CRM.

2.7 DMB shall market the Program in accordance with all, local, State and Federal laws governing the Program as well as provide ongoing administrative and customer support for the Program.

3.  Performance.

3.1 Upon commencement of this Agreement, DMB shall train and inform Affiliate and its employees with respect to aspects the Program and DMB's CRM system, how to enroll Consumers in the Program and DMB will provide a contract to enroll Consumers in the Program.

3.2 Once Affiliate learns about the Program, Affiliate shall commence marketing the Program to Consumers. Affiliate warrants that all employees and subcontractors, if any, used to market the Program shall conform their conduct and activities to the same standards and requirements to which Affiliate is held under the terms of this Agreement. Affiliate shall indemnify DMB against and hold DMB harmless from all unlawful acts of Affiliate's employees and subcontractors.

3.3 When a Consumer is interested In enrolling in the Program, Affiliate will provide such Consumer with an initial consultation and screening to verify eligibility according to the "Client Enrollment Criteria - Exhibit B", attached hereto.

3.4 Affiliate shall only offer the Program to Consumers residing in one of the "DMB Active States - Exhibit C", attached hereto.

3.5 Affiliate acknowledges that Client Enrollment Criteria – Exhibit B and DMB Active States – Exhibit C may change from time to time at DMB direction. Affiliate shall only use the most current version of these documents when offering the Program.

3.6 When a Consumer qualifies for enrollment in the Program, Affiliate will provide such Consumer all documentation related to the Program as provided by DMB. The documents to be executed by such Consumers shall be in the form supplied to Affiliate by DMB.

3.7 Affiliate will market the Program as a stand-alone Program. Affiliate will not condition enrollment in the Program upon the purchase of any other product offered by the Affiliate. Further, Affiliate agrees to be bound by Section 14 "Conflict of Interest", if Affiliate markets other goods and/or services.

**3.8** DMB will provide Affiliate with access to its CRM System, which will host all information related to the Program including qualification guidelines and forms for the Consumers to enter into.

4.   Enrollment Verifications.

    **4.1**    DMB shall review all of Affiliates enrollments of Consumers into the Program and all materials related to those enrollments. Should DMB discover any issue with respect to any Consumer enrollment, DMB will notify Affiliate of such issue and require Affiliate to resolve any issues.

    **4.2**    Affiliate waives the right to any compensation for Invalid enrollments (the "Invalid Enrollments"). For the purposes of this Agreement, Invalid Enrollments shall include, but not be limited to, failure to obtain properly executed DMB enrollment forms from the Consumer authorizing enrollment in the Program, enrolling person who do not meet the Program's specifications as set-forth in the Contract, and any misrepresentations the Affiliate's customer representatives made to Consumers regarding DMB's Program.

5.   Costs and Expenses.

    **5.1**    DMB shall be responsible for all costs associated with the development, creation, maintenance, updating, servicing and administration of the products and services comprising the Program and DMB's CRM system.

    **5.2**    All expenses relating to Affiliate's marketing of the Program are the responsibility of Affiliate.

    **5.3**    Should Affiliate request credit reports from within DMB's CRM system, Affiliate is responsible for the associated costs. Cost per individual credit report is $5.00, subject to change with written notice.

    **5.4**    If an API is required to integrate a 3rd party CRM system with DMB's CRM system for the purposes of the Program, Affiliate is responsible for the associated costs.

    **5.5**    DMB shall be responsible for the billing and collecting of the Program fees and renewals thereof.

6.   Compensation.

    **6.1** Affiliate shall be entitled compensation as defined in "Compensation – Exhibit A" attached to this Agreement.

7.   Exclusivity.

    **7.1**    Affiliate acknowledges that the compensation provided in "Schedule A-Compensation" represents true and valuable consideration between the Parties and exceeds prevailing market rates. In exchange for such consideration, Affiliate agrees that it will not market or promote any other debt settlement program during the term of this Agreement without DMB's express written consent and all Consumers that Affiliate contacts regarding the Program will only be attempted to be enrolled in the Program.

8.   Term.

8.1 This Agreement shall continue in full force and effect for three (3) years from the date of execution of both parties as provided below. This contract shall renew for one (1) year terms unless and until one Party gives the other Party at least ninety (90) days prior written notice of its intent to terminate the Agreement.

8.2 Notwithstanding anything stated in Section 8.1 to the contrary, this Agreement shall terminate immediately upon the occurrence of any of the following events:

(a) any Party files a petition in bankruptcy, is insolvent, makes an assignment for the benefit of its creditors or if a trustee or receiver is appointed for a party, and such event is not dismissed within sixty (60) days;

(b) any Party ceases to do business; and/or

(c) DMB ceases to offer the Program or a reasonable replacement or alternative,

(d) If a Party's performance hereunder is rendered illegal or materially adversely affected by reason of changes in law or regulations (either federal or state) applicable to the services provided to Consumers by DMB or to either Party hereto.

8.3 If a Party is advised in writing by any regulatory agency having or asserting jurisdiction over such Party or the services provided by DMB that the performance of its obligations under this Agreement is or may be unlawful or constitutes or may constitute a deceptive or misleading business practice or that such activity may jeopardize such Party's standing with such regulatory agency, then the Party unable to perform, or whose performance has been rendered illegal or who has been so advised by a regulatory agency, may terminate this Agreement by giving written notice at least thirty (30) days in advance of termination to the other Party, unless such changes in the laws or regulations or communication from such regulatory agency require earlier termination, in which case termination shall be effective upon such earlier required date.

8.4 Under any circumstances that the Agreement terminates in accordance with this Section 8 or because DMB fails to make any payment that it is required to make to Affiliate hereunder as provided herein, then the compensation to be paid by DMB to Affiliate in accordance with Section 6 of this Agreement shall continue to be paid on all Consumers of DMB procured by Affiliate pursuant to this Agreement prior to the termination date as provided therein.

8.5 Return of Property: Upon termination or expiration of this Agreement, DMB property shall be promptly returned to DMB by Affiliate, except Affiliate may retain a copy of such property, including a list of Consumers for record retention purposes.

8.6 Non Disparagement Clause: Upon termination of this Agreement, each Party will refrain from making, spreading or publishing any disparaging or negative comments, statements or implications, whether oral or written, against the other Party that has the effect of damaging the reputation or character, or otherwise having a detrimental affect on the Party. Each Party will continue to uphold the reputation and image of the other Party in public.

9. Non-Competition.

 Company Confidential.

9.1    Affiliate agrees that upon expiration of this agreement that Affiliate's principal(s), member(s), owner(s), or member(s) of their immediate family shall not enter into any agreement to offer similar services with any competitor of DMB for at least one year without the express written consent of DMB.

10.    Representations and Warranties.

10.1    Affiliate continuously represents and warrants to DMB as follows:

10.1.1    Affiliate is a limited liability company duly organized, validly existing and in good standing under the laws of Wyoming and has all requisite power and authority to carry on its business as is now being conducted.

10.1.2    Affiliate has the requisite power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary entity action on the part of Affiliate and requires no further authorization or consent by Affiliate.  This Agreement is the valid and binding obligation of Affiliate, enforceable in accordance with its terms, subject to the effect of bankruptcy, insolvency, moratorium or other laws relating to the rights of creditors generally, and to equitable principles of general application.

10.1.3    All Services offered by Affiliate pursuant to this Agreement are and shall be in compliance with all applicable Federal, State and local laws and regulations and do not infringe upon or violate the rights of any third party.  Moreover, all personal Consumer Information, including all credit card or other account information collected from Consumers, will be obtained and is in full compliance with all applicable Federal, state and local laws and regulations.

10.1.4    Affiliate is and shall be in compliance with all Federal, State and local laws regarding telephone telemarketing services, including, but not limited to state and Federal Do Not Call Lists.

10.1.5    All Consumers procured by Affiliate for DMB shall be considered clients of DMB. Affiliate agrees not to contact any client or customer of DMB for the purpose of soliciting from any such person any business that is similar to the business conducted by DMB.  Affiliate may market products or services to Consumers procured by Affiliate in the future as long as the products or services do not compete directly with DMB's Program and Services.

10.1.6    Affiliate will not in any way directly or indirectly, for itself or on behalf of, or in conjunction with, any other person, firm, partnership, corporation, or other entity, solicit, divert, or take away any referred Consumers or clients of DMB during the term of this Agreement or at any time thereafter.

10.2    DMB continuously represents and warrants to Affiliate as follows:

10.2.1    DMB is a Limited Liability Company duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts and has all requisite entity power and authority to carry on its business as is now being conducted.

**10.2.2** DMB has the requisite entity power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary entity action on the part of DMB and requires no further authorization or consent by DMB. This Agreement is the valid and binding obligation of DMB, enforceable in accordance with its terms, subject to the effect of bankruptcy, insolvency, moratorium or other laws relating to the rights of creditors generally, and to equitable principles of general application.

**10.2.3** DMB will operate the Program in accordance with all state and Federal laws applicable to the Program and in a manner consistent with good business practice.

**10.2.4** The Client Enrollment Qualifications and enrollment contracts provided by DMB comply with all applicable laws, statutes, regulations, ordinances and other legal requirements.

11.  **Confidentiality.** "Confidential Information" of a Party shall mean and include information about hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, business plans and strategies, documents, scripts, contracts, guidelines, customer names and all other information related to customers, including without limitation any "nonpublic personal information" as defined under the GLB Act and regulations promulgated thereunder, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons. Confidential Information shall also include such confidential and proprietary information or material belonging to a disclosing party (the "Disclosing Party") of or to which the other Party may obtain knowledge or access through or as a result of the performance of its obligations under this Agreement. Confidential Information also includes any information described above which the Disclosing Party has obtained in confidence from another party who treats it as proprietary or designates it as Confidential Information, whether or not owned or developed by the Disclosing Party.

11.1  **Exceptions.**

**11.1.1** Notwithstanding anything to the contrary herein, neither Party shall have any obligation with respect to any Confidential Information of the other Party, or any portion thereof, which the receiving Party (the "Receiving Party") can establish by competent proof (including, but not limited to, ideas, concepts, 'Know-how' techniques, and methodologies); (i) is or becomes generally known to companies engaged in the same or similar businesses as the Parties hereto on a non-confidential basis, through no wrongful act of the Receiving Party; (ii) is lawfully obtained by the Receiving Party from a third party which has no obligation to maintain the information as confidential and which provides it to the Receiving Party without any obligation to maintain the information as proprietary or confidential; (iii) was known prior to its disclosure to the Receiving Party without any obligation to keep it confidential as evidence by tangible records kept by the Receiving Party in the ordinary course of its business; (iv) is independently developed by the Receiving Party without reference to the disclosing Party's

Commonwealth Servicing Group Affiliate Agreement          Company Confidential.

Confidential Information; or (v) is the subject of written agreement whereby the Disclosing Party consents to the use or disclosure of such Confidential Information.

11.1.2   If a Receiving Party or any of its representatives shall be under a legal obligation in any administrative or judicial circumstance to disclose any Confidential Information, the Receiving Party shall give the Disclosing Party prompt notice thereof so that the Disclosing Party may seek a protective order and/or waiver, if the Receiving Party or any such representative shall, in the opinion of its counsel, stand liable for contempt or suffer other censure or penalty for failure to disclose, disclosure pursuant to the order of such tribunal may be made by the Receiving Party or its representative without liability hereunder.

## 11.2   Disclosure and Protection of Confidential Information.

11.2.1   Each Party warrants the disclosure of Confidential Information to the other Party is in accordance with applicable state and Federal law and the Party's own stated privacy policies.  Each Party agrees not to use Confidential Information of the other Party for any purpose other than the fulfillment of such Party's obligations to the other Party under this Agreement.  All Confidential Information relating to a Party shall be held in confidence by the other Party to the same extent and in as least the same manner such Party protects its own confidential or proprietary information.  Neither Party shall disclose, publish, release, transfer or otherwise make available Confidential Information of the other Party in any form to, or for the use or benefit of, any person or entity without the other Party's consent. Each Party shall, however, be permitted to disclose relevant aspects of the Party's Confidential Information to its officers, agents, subcontractors, and employees to the extent that such disclosure is reasonably necessary for the performance of its duties and obligations under this Agreement provided such disclosure is not prohibited by the "GLB Act," the regulations promulgated thereunder or other applicable law; provided, however, that such Party shall take all reasonable measure to ensure that Confidential Information of the other Party is not disclosed or duplicated in contravention of the provisions of this Agreement by such officers, agents, subcontractors and employees.  Each Party further agrees promptly to advise the other Party in writing of any misappropriation, or unauthorized disclosure or use by any person of Confidential Information which may come to its attention and to take all steps reasonable requested by the other Party to limit, stop or otherwise remedy such misappropriation, or unauthorized disclosure or use.  If the GLB Act, the regulations promulgated thereunder or other applicable law now or hereafter in effect imposes a higher standard of confidentiality to the Confidential Information, such standard shall prevail over the provisions of this Section 9.

11.2.2   Neither Party will make any more copies of the other Party's written or graphic materials containing Confidential Information than is necessary for its use under the terms of this Agreement, and each such copy shall be marked with the same proprietary notices as appear on the originals.

11.2.3   Each Party shall, at a minimum, protect the Confidential Information of the other Party in the same manner as it protects its own Confidential Information.

11.2.4   Each Party shall develop, implement and maintain a comprehensive written information security program to protect Confidential Information ("Security Program") that includes administrative, technical and physical safeguards appropriate to its size and complexity and nature and scope of its activities in compliance with the GLB Act, Section 501(b) and regulations promulgated thereunder. The objective of each such Security Program shall be to insure the security and confidentiality of Confidential Information, protect against any anticipated threats or hazards to the security or integrity of Confidential Information and protect against the unauthorized access to or use of Confidential Information that could result in substantial harm or inconvenience to any customer.

11.2.5   Each Party will ensure that any third Party to whom it transfers Confidential Information enters into an agreement to protect the confidentiality and security of Confidential Information in the same manner as required by this Agreement and in compliance with the GLB Act and regulations promulgated thereunder.

11.2.6   Upon written request, a Party shall provide to the other Party information, such as audits or summaries of test results, demonstrating the effectiveness of its Security Program.

11.3   Return of Materials. For as long as a Party continues to possess or control the Confidential Information furnished by the other Party, and for so long as the Confidential Information remains unpublished, confidential and legally protectable as the intellectual property of the disclosing Party, except as otherwise specified herein, the Receiving Party shall make no use of such Confidential Information whatsoever, notwithstanding the expiration of the Agreement. The Parties acknowledge their understanding that the expiration of this Agreement shall not be deemed to give either Party a right or license to use or disclose the Confidential Information of the other Party. Any materials or documents, including copies thereof, which contain Confidential Information of a Party shall be promptly returned to such Party upon the request of such Party except that copies may be retained, if required, for legal or financial compliance purposes. Upon termination or expiration of this Agreement, all materials or documents, including copies thereof, which contain Confidential Information of a Party shall be promptly returned to such Party or destroyed except that copies may be retained, if required, for legal or financial compliance purposes.

11.4   Injunctive Relief. It is agreed that the unauthorized disclosure or use of any Confidential Information may cause immediate or irreparable injury to the Party providing the Confidential Information, and that such Party may not be adequately compensated for such injury in monetary damages. Each Party therefore acknowledges and agrees that, in such event, the other Party shall be entitled to seek any temporary or permanent injunctive relief necessary to prevent such unauthorized disclosure or use, or threat of disclosure or use, and consents to the Jurisdiction of any federal or state court of competent jurisdiction sitting in Essex County, Massachusetts for purposes of any suit hereunder and to service of process therein by certified or registered mail, return receipt requested.

11.5   Consumer Information. It is hereby acknowledged and agreed by Affiliate that all information relating to a Consumer procured by Affiliate, as it relates to DMB's services, shall be treated as part of DMB's Confidential Information.

12. Legal Compliance. If Affiliate makes telephone calls related to the marketing of the Program, then Affiliate shall at all times during the term of this Agreement, comply with all laws and regulations applicable to telemarketing, including but not limited to, Federal, State, local law or regulation, the Telephone Consumer Protection Act, the Telemarketing Sales Rule, state telemarketing laws and regulations, and regulations that may be applicable to its telemarketing activities on behalf of DMB. For the avoidance of doubt, whether Affiliates services should be governed by this Section and whether a law, regulation, or order is deemed applicable to telemarketing for the purposes of this Agreement, shall be at DMB's sole discretion.

13. Indemnification.

13.1 Affiliate agrees to indemnify and hold harmless DMB, its subsidiaries, affiliates, and controlling companies, and all their respective directors, officers, agents and employees, from and against any and all liability, actions, claims, demands, liens, losses, costs, damages, judgments and expenses incurred, occasioned by, resulting from, arising out of, related to, or in connection with any activity undertaken by Affiliate under this Agreement. Such indemnification shall specifically include, but shall not be limited to, any regulatory fines, premium refunds and/or any expenses of corrective actions taken by DMB due to Affiliate's failure to abide by the provisions of Paragraph 2, 3, 6, 8, 9, 10 11 and 12 of this Agreement. Affiliate shall be responsible for the defense of all such actions, claims, demands and suits, and shall pay all costs and charges resulting therefrom, including attorney's fees. Affiliate's selection of counsel shall be subject to the approval of DMB. DMB shall have the right, however, to retain separate counsel at DMB's cost and expense and participate in the defense of any such actions, claims, demands and suits. Affiliate agrees to hold DMB harmless from a claim or action against DMB for actual or alleged infringement of any patent, copyright, trade secret or other proprietary rights of any person by the Affiliate's system, or any part thereof, except to the extent such claim is caused by: (i) DMB's failure to use the Affiliate's system as permitted under Agreement, (ii) DMB's use of the Affiliate's system in combination with other software or systems not expressly authorized by Affiliate, or (iii) the development of software, scripts or programs by Affiliate as requested by DMB using designs or specifications provided by DMB.

13.2 DMB shall also have the right to take over the defense of any such actions, claims, demands and suits. If DMB takes over such defense, Affiliate shall have the right to participate in the defense, at its own cost and expense. Each Party shall cooperate with the other as reasonably requested in such defense, and shall not consent to any judgment, order or decree against the other Party without the other Party's consent. Each Party may, with the other Party's consent, settle any such actions, claims, demands, and suits.

13.3 Neither Affiliate nor DMB shall withhold its consent under this Section 11.2. Each Party shall keep the other Party fully informed at all times with respect to material developments in all actions, claims, demands and suits being defended by either Party in accordance herewith, including written status reports on a quarterly basis.

13.4 The provisions of this Section 11 shall survive the termination of this Agreement.

14. Conflict of Interest.

14.1 DMB acknowledges that Affiliate may offer and/or otherwise make available to individuals products and/or services other than the Program.

14.2    Affiliate agrees, however, that it will not market and/or sell similar or like products and/or services (debt settlement) to any Clients that Affiliate enrolls into DMB's Program.

15.    Communication Requirements. All notices, consents and other communication hereunder shall be in writing, transmitted, prepaid, registered or certified mail, return receipt requested or by a nationally recognized overnight delivery service, or via facsimile or email, and shall be deemed effective as of the date of mailing to the addresses shown on the first page of this Agreement. Such addresses may be subsequently changed by such notice.

16.    Advertising Restraint. Affiliate agrees that it will not use the name, service marks, or trademarks of DMB, or reveal the existence of this Agreement, terms or conditions thereof, in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless DMB provides prior written consent to such use.

17.    Use of Consumer List. Affiliate shall not market or otherwise release or distribute any information identifying the names, addresses, telephone numbers or other customer information of Consumers who have enrolled in the Program without the prior written consent of DMB. This provision shall survive the termination of this Agreement.

18.    Background Checks. Affiliate will have a policy to not use an employee or contractor for services under this Agreement if its reasonable review indicates that such individual has (i) been prohibited from selling debt negotiation and settlement or similar services; (ii) recently been convicted of any felonies or other crimes involving allegations of dishonesty, fraud or theft. DMB will have a policy to not use an employee or contractor for services under this Agreement and for Consumers if its reasonable search indicates that such individual has (i) been prohibited from selling debt negotiation and settlement or similar services; (ii) recently been convicted of any felonies or other crimes involving allegations of dishonesty, fraud or theft.

19.    Audit. DMB shall have the right, upon ten (10) business days notice, to enter Affiliate's premises, and review, during regular business hours, the books and records of Affiliate to verify compliance with DMB's policies, procedures and standards; compliance with this Agreement including the confidentiality provisions of this Agreement, and/or demand copies of records and documents to verify such compliance. Affiliate shall provide copies of records and documents upon such request for purposes of this Audit. Affiliate shall have the right, upon ten (10) business days notice, to enter DMB's premises and review during regular business hours relevant books and records of DMB to verify Affiliate has been properly paid for all Consumers referred by Affiliate and accepted by DMB pursuant to this Agreement or to verify the client service standards being provided to such referred Consumers. DMB shall provide copies of records and documents upon such request for purposes of this Audit.

20.    Reporting. DMB agrees to provide Affiliate a monthly performance report in an agreed upon format that shows Affiliate's performance.

21.    Visitation. Either Party may reasonably request the other Party to visit other Party's office or each Party may visit the other Party's office to observe services performed. The expense of such travel shall be borne by each Party, respectively. Adequate notice must be provided by the requesting Party to the other Party.

22.    Agreement Not To Solicit Or Employ Employees. Affiliate agrees that Affiliate will not at any time hire or employ, directly or indirectly, any person employed by DMB for a period of one year after that person leaves the employment of, or is voluntarily or involuntarily terminated by, DMB. Affiliate will make reasonable efforts to assure that it does not knowingly or unknowingly violate

this provision. Such efforts are to include with limitation requiring that any prospective employee truthfully certify as a condition of employment that he or she was not previously employed by DMB. Affiliate agrees that the damages that will be suffered by DMB in the event any violations of this provision are substantial, but difficult to ascertain. Therefore, Affiliate agrees that in the event of any knowing violation of this provision, the Affiliate will pay DMB the amount equal to one year's salary of the person causing the violation as liquidated damages and not as a penalty for each violation. Affiliate further agrees that if DMB determines that a violation of this term of this Agreement will cause irreparable injury that cannot readily be measured in monetary amounts and that only injunctive relief will provide proper redress and the Affiliate consents to equitable injunctive relieve to resolve any violation of the provisions of this paragraph.

23. **Liability For Ceasing Business or Termination:** In the event DMB ceases to do business or terminates as described in Section 8 above, Affiliate will be entitled to compensation as described in Section 6 for any clients that enrolled prior to DMB ceasing operations or termination assuming those clients continue to be serviced and make payments under their debt settlement agreement. In the event DMB ceases to do business, DMB shall have first right to transfer or sell existing customer base so long as obligations to affiliate continue to be met. In the event Affiliate ceases to do business, it shall not have any liability to DMB except for those existing customers prior to the ceasing of operations by Affiliate.

24. **Exercise of Rights.** The exercise by either Party of any right or remedy herein provided shall be without prejudice to the exercise of any other right or remedy.

25. **Independent Contractor.** The Parties hereto are independent contractors and nothing contained herein shall be construed to create any association, partnership, or joint venture between the Parties hereto, and neither Party shall have the power to obligate or bind the other, in any manner whatsoever, without prior written consent of the Party to be bound or obligated.

26. **Assignment.** Neither this Agreement nor any rights or duties hereunder may be assigned or transferred in whole or in part by either Party, without the prior written consent of the other. In all other respects, this Agreement shall be binding upon and shall inure to the benefit of the Parties, their respective successors and assigns.

27. **Governing Law.** This Agreement and any schedule, exhibit, or amendment hereto shall, in all respects, be governed by, and construed in accordance with the laws of the Commonwealth of Massachusetts and any Interpretation rules that the choice of words in an agreement shall be construed against the drafter of an agreement shall not apply. If any provision of this Agreement is ever deemed invalid or unenforceable, this Agreement shall be construed as though such provision does not appear herein, and shall be otherwise fully enforceable.

28. **Attorneys' Fees.** In the event either party shall be forced to enforce this Agreement, whether or not through litigation, the prevailing party shall be entitled to receive reasonable attorneys' fees and all costs incurred in connection with such enforcement, including fees and costs of appeal.

29. **Waiver.** No indulgences expended by any party hereto or any other party shall be construed as a waiver of any breach on the part of such other party, nor shall any waiver of one breach be construed as a waiver of any rights or remedies with respect to any subsequent breach.

30. **Entire Contract.** This Agreement and the attached schedules contain the entire Agreement between the Parties hereto regarding telemarketing to DMB's customers. This Agreement shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon, in writing, by the Parties hereto.

---

Commonwealth Servicing Group Affiliate Agreement Company Confidential.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed in duplicate by their respective, duly authorized officers, to become effective the day and year first above written.

Symple Lending, LLC

By:

Name: Houston Fraley

Title: CEO

Symple Lending, LLC

By:

Name: Gary Lozano

Title: CRO

DMB Financial, LLC

By:

Name: Matthew Guthrie

Title: Member

---

12      Commonwealth Servicing Group Affiliate Agreement      Company Confidential.

Compensation – Exhibit A

INSERT COMPENSATION TERMS

Commonwealth Servicing Group Affiliate Agreement        Company Confidential.