# EXHIBIT

# 3



May 13, 2021

Symple Lending, LLC
30 N Gould St. Ste11985
Sheridan, WY 82801

Via Email Delivery: houston@symplelending.com, gary@symplelending.com

Re: Letter of Intent

Dear Houston and Gary:

This letter of intent *("LOI")* sets out the principal terms of a proposal being considered by DMB Financial, LLC, a Massachusetts limited liability company *("DMB")* for the purpose of acquiring from Blackstone Holdings Group, LLC, a Wyoming Limited Liability Company ("*Blackstone*"), a minority ownership interest in Symple Lending LLC, a Wyoming Limited Liability Company *("Symple")*. The relationship that is the subject of the proposal is referred to as the *"Transaction"* and DMB and Blackstone are referred to collectively as the *"Parties"* and each, individually, as a *"Party"*.

1. <u>Non-Binding.</u> Except for the provisions of Sections 3 and 5 through 9 and the requirement of this paragraph 1 regarding entry into negotiations, this LOI is not binding on the Parties; it is only an expression of basic terms and conditions that the Parties presently intend to incorporate in a formal written agreement that will govern the Transaction *("Definitive Agreement")*. No binding agreement shall exist with respect to the Transaction unless and until the Definitive Agreement has been duly executed and delivered by both Parties. As soon as practicable following the acceptance and approval of this LOI by Blackstone, the Parties shall enter into negotiations with the objective of executing the Definitive Agreement. DMB's counsel shall prepare the initial draft of the Definitive Agreement.

2. <u>Transaction.</u> It is the present intention of the Parties that, upon execution of the Definitive Agreement, DMB would acquire 30% of the equity interests of Symple, as more fully set out in the attached Exhibit A, at the price set out therein. The Definitive Agreement would include the terms set forth in Exhibit A and as otherwise later mutually agreed to by the Parties, and would further contain such covenants, conditions, indemnities, representations, and warranties as the Parties shall mutually agree.

3. <u>Term and Termination.</u> This LOI will automatically terminate and be of no further force and effect upon the earlier of (i) execution of the Definitive Agreement by the Parties, (ii) mutual agreement of the Parties, and (iii) 5:00 PM (EST) on May 14, 2021. Notwithstanding anything in the previous sentence, Section 6, Section 7, Section 8 and Section 9 shall survive the

termination of this LOI and the termination of this LOI shall not affect any rights a Party has with respect to the breach of this LOI by the other Party prior to such termination.

4. <u>Access; Certain Limitations</u>. Blackstone will cause Symple to afford DMB access to such of Symple's personnel, properties, contracts, books and records and all other documents and data as DMB shall reasonably request, which shall be deemed Confidential Information, as defined below. Further, each Party agrees that: (a) no Party will make any inquiries of the other's customers, suppliers, lenders, employees or other persons having dealings with the other Party without the express prior written consent of the representative of the disclosing Party designated above (which may be withheld for any reason and for no reason); and (b) in recognition of any competitive relationship between the Parties as to certain services or products and in order to protect the Parties' operations and business if the proposed Transaction does not occur, (i) the Parties will develop procedures to protect certain sensitive information (including without limitation each Party's Confidential Information and the persons who may have access to it) and (ii) all disclosures will be made in accordance with the requirements of applicable antitrust laws.

5. <u>Exclusive Dealing; Remedies.</u> Until the date of termination as contemplated in paragraph 3 above: (i) Blackstone will not, directly or indirectly, through any representative or otherwise, solicit or entertain offers from, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any other person relating to a transaction that is substantially similar in nature to the Transaction or that relates to any extension of an existing agreement or entering into a new agreement with a direct competitor of DMB; and (ii) Blackstone will immediately notify DMB regarding any contact between Blackstone or its representatives and any other person regarding any such proposal or any related inquiry. Each Party hereby agrees that if Blackstone breaches its obligations in this paragraph 5 or paragraph 7 of this LOI, DMB would suffer substantial damages that would be difficult or incapable of precise estimation. Accordingly, if Blackstone breaches such obligations, it will pay DMB liquidated damages equal to the sum of Twenty-Five Thousand Dollars ($25,000). Further, the Parties agree and acknowledge that, based on the information available to them at the time this LOI is being executed, including but not limited to the time, effort, fees, expenses, and opportunity costs that DMB anticipates expending in connection with working towards a Definitive Agreement and completing the Transaction, the liquidated damages called for under this paragraph is a reasonable estimate of the probable loss that DMB would suffer under the circumstances indicated and would not act as a penalty.

6. <u>Governing Law and Forum Selection.</u> This LOI shall be governed by and construed in accordance with the internal laws of the State of Wyoming, without giving effect to any choice or conflict of law provision <u>or</u> rule (whether of Wyoming or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of Wyoming. Jurisdiction of all disputes between the Parties shall vest solely and exclusively in Wyoming and suit may not be filed in any other jurisdiction. Further, the Parties consent to the jurisdiction of any court in Wyoming and agree to waive any defense on the grounds of forum non-conveniens or otherwise that Wyoming is not an appropriate forum.

7. <u>Confidentiality.</u> This LOI, the matters discussed herein and information provided by one Party to the other in connection herewith (collectively, *"Confidential Information")* are confidential and shall not be disclosed by the receiving Party without the written consent of the

other Party, except to the extent that disclosure is required by law or to the extent permitted below. When disclosure is required, the Party making the disclosure shall immediately provide notice of the requested disclosure to the other Party and shall take all reasonable steps to limit the extent of the disclosure to the minimum required to comply with its legal obligations, including allowing the other Party full opportunity to object to the disclosure before disclosure is made and/or to "claw back" any prior disclosure. Neither Party shall have any obligation with respect to any Confidential Information that is or becomes publicly available without fault of the Party receiving the Confidential Information.

Except to the extent Confidential Information provided (i) is already in the other Party's possession, (ii) is or becomes generally available to the public without fault of the Party receiving the Confidential Information (or the fault of any representative of such receiving Party), or (iii) is or becomes available to the other Party on a non-confidential basis, such Confidential Information will be kept in strict confidence. If this LOI is terminated for any reason, such Confidential Information and all copies thereof will be destroyed or returned to the disclosing Party.

8. No Third-Party Beneficiaries. Nothing herein is intended or shall be construed to confer upon any person or entity other than the Parties and their successors or assigns, any rights or remedies under or by reason of this LOI.

9. Expenses. Each of the Parties shall bear its respective costs, charges, and expenses for the business review, preparation, and negotiation of this LOI and the Definitive Agreement or incurred in connection with the Transaction contemplated by this LOI, including, but not limited to, fees of their respective counsel, accountants, and other advisors or consultants.

10. Miscellaneous. Neither this LOI nor any rights or obligations hereunder may be assigned, delegated, or conveyed by either Party without the prior written consent of the other Party. This LOI may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement. The headings of the various sections of this LOI have been inserted for reference only and shall not be deemed to be a part of this LOI.

[SIGNATURE PAGE FOLLOWS]

If you are in agreement with the terms set forth above and wish to proceed with negotiating a Definitive Agreement for the proposed Transaction on that basis, please sign your acceptance of this LOI in the space provided below and return an executed copy no later than May 14, 2021.

Very truly yours,

**DMB Financial, LLC**

By: _____
Name: John Caron
Title: Chief Revenue Officer

Accepted this 12 day of May, 2021

**Blackstone Holdings Group, LLC**

By: _____
Name: Houston Fraley
Title: Member

By: _____
Name: Gary Lozano
Title: Member

EXHIBIT A

Key Business Terms of Transaction

1. Ownership. DMB with purchase from Blackstone 30% of Blackstone's membership interest in Symple.

2. Purchase Price. The purchase price will be $650,000 in total, if all earnout conditions are achieved ("Purchase Price"). The Purchase Price assumes a debt-free, cash free Transaction, and assumes that Symple will have adequate working capital after the payment of all Transaction-related expenses, excluding, for avoidance of doubt, any Transaction-related expenses of DMB. DMB will pay the Purchase Price as follows:

    (a) DMB shall pay to Blackstone $150,000 of the Purchase Price by wire transfer of immediately available funds, simultaneous with the closing of the Transaction (the "Closing"); and

    (b) DMB shall pay to Blackstone $350,000 of the balance of the Purchase Price (the "Earn-Out Amount") by separate wire transfers of immediately available funds, on the dates and upon achieving the milestones described in Paragraph 5.

    (c) DMB shall pay to Blackstone $150,000 of the balance of the Purchase Price (the "Special Profit Distribution") by a wire transfer of separate immediately available funds, on the date and upon achieving the milestones described in Paragraph 9.

3. Definitive Agreements. The parties will prepare Definitive Agreements for the Transaction contemplated hereby consistent with transactions of this nature, which will include, among other things, (a) a membership interest purchase agreement (with customary representations, warranties, pre-closing and post-closing covenants, closing conditions and indemnification provisions, and non-competition and non-solicitation agreements of the members of Blackstone (two (2) year duration upon the sale of Blackstone's remaining membership interest in Symple) to effectuate the purchase of the Company, (b) the employment agreements referenced below and (c) other agreements as may be necessary or desirable to consummate the transaction.

A proposed definitive membership interest purchase agreement (the "Definitive MIPA") shall be drafted by the DMB's legal counsel, Burns & Levinson LLP. The representations and warranties of the Company and its subsidiaries in the Definitive MIPA, shall be subject to a survival period of twenty-four (24) months (other than with respect to organization, authority, title, brokers, and capitalization, which shall survive indefinitely; and indebtedness, employees, no breach (i.e. no breach means no breach of governing documents or governmental orders or applicable laws, and no breach of the existing contracts), no liens, and no payments triggered under contracts (such as termination, change of control, severance etc.),

and taxes, which shall survive to thirty (30) days after the expiration statute of limitations applicable thereto, such representations and warranties, separately and collectively, the "Fundamental Reps"). In addition, for purposes of determining indemnity claims, materiality qualifiers shall be scraped from the representations and warranties.

4. Operating Agreement; Management; Voting. Symple will adopt an amended and restated operating agreement upon the Closing, with terms reasonably acceptable to DMB, which shall include customary provisions, including a confidentiality, restrictions on transfer, drag-along and non-competition, and provide for the creation of a board of managers ("Board") to manage the operations of Symple. The Board will be comprised of 5 seats, 3 of which DMB shall appoint, and who shall initially be: John Caron, Daniel Kwiatek, Matthew Guthrie, Houston Fraley and Gary Lozano. Voting rights shall be proportional to ownership interest. For avoidance of doubt, in the event that the Transaction proceeds to Closing, at the time of adoption of the amended and restated operating agreement; (i) Houston Fraley and Gary Lozano would each be entitled to voting rights equal to 35% to reflect their equity stake in Blackstone, the owner of 70% of the outstanding membership interest in Symple; and (ii) John Caron, Daniel Kwiatek, and Matthew Guthrie would be entitled to aggregate voting rights equal to 30% to reflect DMB's ownership of 30% of the outstanding membership interest in Symple, apportioned among them according to their individual equity stakes in DMB.

5. Post-Closing Earnout. After the Closing, Blackstone will be entitled to the Earn-Out Amount according to the following conditions:

> If, in any month, the previous month's Gross enrollments are greater than $3,000,000.00, a payment of $50,000.00 shall be due to Blackstone on the Friday of the first full week of the current month;

> If, in any month, the previous month's Gross enrollments are greater than $5,000,000.00, a payment of $100,000.00 shall be due to Blackstone on the Friday of the first full week of the current month; and

> If, in any month, the previous month's Gross enrollments are greater than $10,000,000.00, a payment of $100,000.00 shall be due to Blackstone on the Friday of the first full week of the current month.

> This earnout will continue until the entire $350,000 Earn-Out Amount is achieved.

6. Initial Management Salary. At the Closing, the Board will appoint Houston Fraley and Gary Lozano as Managers of Symple. Houston and Gary shall be paid an annual salary of

$120,000 each. Additionally, Houston and Gary shall receive distributions according to their respective ownership interests. Distributions require approval of the majority of outstanding interests in Symple.

7. **Optional Management Incentive.** Houston and Gary shall be entitled to, at their option and the satisfactory achievement of three consecutive months of net new debt enrolled of $10,000,000 or Jan. 1, 2022, whichever occurs first, to transition their compensation model to receive a percentage of the settlement fees earned for clients that are enrolled through Symple. The percentage of the settlement fee that Houston and Gary shall be entitled to is listed in the chart below and is dependent about the amount previous month's net new debt enrolled and cleared first drafts.

| Monthly Net New Debt Enrolled | Settlement Fee Percentage |
|---|---|
| $0 - $9,999,999 | 0.00 % |
| $10,000,000 - $24,999,999 | 5.00 % |
| $25,000,000 or more | 10.00 % |

8. **Symple Affiliate Agreement.** As a condition of Closing, Symple shall execute an Affiliate agreement with DMB. The terms of the Affiliate agreement shall include a 6.75% referral fee to Symple for all new client enrollments that clear their first full monthly program payment. In the event Houston and Gary elect to the Optional Management Incentive, a new Affiliate agreement will be executed and reflect a 6.5% referral fee to Symple for all new client enrollments that clear their first full monthly program payment and the Optional Management Incentive shall be paid to Blackstone.

9. **Special Profit Distribution** – Once profitably in three consecutive months is at least $50,000, the Board will agree to release $150,000 to be used exclusively to repay the outstanding balance of the loan used to initially capitalize Symple. For avoidance of doubt, the release by the Board of $150,000 as contemplated in this Paragraph 9 shall be deemed a portion of the Purchase Price.

10. **DMB Liquidity Event.** If DMB enters into a liquidity event where more than 50% of DMB is acquired by a third party, whether affiliated or unaffiliated, Symple may participate in said liquidity event based on a valuation of Symple as of the effective date of said liquidity event. If the acquiror of DMB values Symple as part of the Enterprise of DMB, then Symple shall participate in the liquidity event. The acquiror shall independently value both DMB and Symple. Each value shall be

applied to each company and distributed to according the ownership interests of each company respectively. For example, if DMB is valued at $15 million and Symple at $5 million, the $15 million shall be distributed to then ownership of DMB and the $5 million shall be distributed to the then ownership of Symple. .

11. Other Conditions to Closing:

    i.    All contracts by and between Symple or any of its affiliates with any backend will need to be terminated, and Symple and any of its successors will need to be fully released from any tail obligations, including any non-compete period following the termination.

    ii.    DMB being satisfied with the results of the due diligence investigation performed by its attorneys, accountants and representatives. Including, but not limited to, confirmation that Blackstone is the sole member of Symple (and that Houston and Gary are the sole members of Blackstone), there are no other competitive barriers such as non-competes, affiliate agreements, or other agreements binding Houston, Gary, Blackstone, or Symple, and upon the execution of this LOI and beginning on May 24, 2021 all new client enrollments are transitioned to DMB and its affiliates with the exception of those owed to any existing agreements at are valid and enforceable at the time of execution of this LOI.

    iii.    The formal approval of the Board of Managers of DMB and the members of Blackstone, to the transactions contemplated hereby, including the express consents and waivers of all claims of all members of Symple, and if required for execution of Definitive MIPA, consents of the members of DMB; and

    iv.    The obtaining of all necessary governmental and third party consents and approvals necessary or desirable to facilitate consummation of the Transaction.